# EXHIBIT 1

Exhibit 1 - Page 3

```
 1                    UNITED STATES DISTRICT COURT
 2                   CENTRAL DISTRICT OF CALIFORNIA
 3                          WESTERN DIVISION
 4                               - - -
 5     HONORABLE FERNANDO M. OLGUIN, DISTRICT JUDGE PRESIDING
 6
 7    AMANDA HILL,                )
                                  )
 8          Plaintiff,            )
                                  )
 9                                )
                                  )
10          vs.                   ) No. CV 19-00163-FMO
                                  )
11                                )
                                  )
12    QUICKEN LOANS, INC.,        )
                                  )
13          Defendants.           )
      _____)
14
15
                    REPORTER'S TRANSCRIPT OF PROCEEDINGS
16
                           EVIDENTIARY HEARING
17
                         LOS ANGELES, CALIFORNIA
18
                       MONDAY, DECEMBER 16, 2019
19
      _____
20
21                         MARIA R. BUSTILLOS
                          OFFICIAL COURT REPORTER
22                             C.S.R. 12254
                         UNITED STATES COURTHOUSE
23                         350 WEST 1ST STREET
                               SUITE 4455
24                   LOS ANGELES, CALIFORNIA 90012
                             (213) 894-2739
25
```

**A P P E A R A N C E S**

**ON BEHALF OF THE PLAINTIFFS,**
**AMANDA HILL:**  HEDIN HALL, LLP
DAVID WILLIAM HALL, ESQ.
BY: FRANK S. HEDIN, ESQ.
4 EMBARCADERO CENTER
SUITE 1400
SAN FRANCISCO, CA 94104
(415)766-3534

KAZEROUNI LAW GROUP, APC
BY: SEYED ABBAS
KAZEROUNIAN, ESQ.
245 FISCHER AVENUE
UNIT D1
COSTA MESA, CA 92626
(800)400-6808

**ON BEHALF OF THE DEFENDANTS,**
**QUICKEN LOANS, INC.:**  MORGANROTH and MORGANROTH, PLLC
BY: JEFFREY B. MORGANROTH, ESQ.
344 NORTH OLD WOODARD AVENUE
SUITE 2000
BIRMINGHAM, MI 48009
(248-864-4000

GOODWIN PROCTER, LLP
BY: WILLIAM KYLE TAYMAN, ESQ.
1900 N STREET NW
WASHINGTON, DC 20036
(202)346-4000,

**I N D E X**

|  |  | PAGE |
|---|---|---|
| DEFENSE'S CASE........................ | | 7 |

| DEFENSE'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **RICH, BEN** | -- | -- | -- | -- |
| BY JEFFREY MORGANROTH | 7 | -- | 50 | -- |
| (FURTHER) | -- | -- | 55 | -- |
| BY FRANK HEDIN | -- | 37 | -- | **54** |
| **SMITH, LARRY** | -- | -- | -- | -- |
| BY WILLIAM TAYMAN | 58 | -- | -- | -- |

- - -

**E X H I B I T S**

| DEFENSE'S | RECEIVED | MARKED |
|---|---|---|
| 1 | 15 | -- |
| 4 | 16 | -- |
| 2 | 24 | -- |
| 54 | 30 | -- |
| 5B | 30 | -- |
| 6 | 33 | -- |
| 8 | 62 | -- |
| 7 | 73 | -- |

- - -

```
 1   we did match her, right, in both instances to clients.
 2   Q    Okay.  And I think you testified that the
 3   re- -- is it retargeting or --
 4   A    The retention campaign.
 5   Q    The retention campaign was a campaign that's done in
 6   order to match people?
 7   A    The -- the idea of a retention campaign is when we've
 8   already had one interaction with a consumer, and they haven't
 9   transacted with our clients, meaning, they haven't
10   reidentified or whatever the case may be.  Then we'll
11   reengage or we'll do -- we'll run the retention campaign to
12   see if they want to come back to LowerMyBills to be matched
13   again.
14   Q    Even though --
15              THE COURT:  How do often do you reengage?
16              THE WITNESS:  It depends.  I mean, usually the
17   first one would be 30 days would be the first attempt.  Um,
18   and then it could be another 30, 60, 90 -- and then I don't
19   remember what the cutoff is, but if we don't have
20   interaction, then after -- again, I don't know the exact day
21   but 90, 120 in that kind of ballpark days, we'll stop.
22              THE COURT:  Go ahead, Counsel.
23   BY MR. HEDIN:
24   Q    And you testified earlier that you have frequented
25   YourVASurvey site regularly since October of 2018 and most
```

```
 1    recently a few days ago; is that correct?
 2    A    Yes, I have been to it most recently in the last couple
 3    days.
 4    Q    Okay.  Did the YourVASurvey.info site that existed in
 5    October 2018, did it look the same then as it does today and
 6    function the same way?
 7    A    I don't know that I can answer that in terms of, you
 8    know, what it looked like in 2018 and what it looks like
 9    today if it's verbatim or not.
10    Q    But you can't point to any substantive differences that
11    you're aware of?
12    A    Um, yes, I -- I don't know of any substantial
13    differences; but again, I didn't do that kind of, like,
14    capture in 2018 and then look again in 2019 and do some kind
15    of comparison or contrast.
16         Did that answer your question?
17    Q    Yes, thank you.
18    A    Okay.
19         MR. HEDIN:  Yeah, we have nothing further.  Thank
20    you, Mr. Rich.
21                       REDIRECT EXAMINATION
22    BY MR. MORGANROTH:
23    Q    Mr. Rich, plaintiff's counsel was asking you some
24    questions earlier about Jornaya and how it worked.  You've
25    testified that LMB on its website loads or inserts Jornaya
```

```
 1   code on its web pages; is that right?
 2   A    Yes.
 3   Q    And is that on every page does LMB load the code?
 4   A    Yes, on every page.
 5   Q    Okay.  If a code -- if the code is not loaded on a
 6   particular page, will that page be tracked and validated in
 7   part of the video playback?
 8   A    No, you have -- you have to have the code in order for
 9   Jornaya to make the capture.
10   Q    Now, there's a --
11             THE COURT:  You have to have what code?
12             THE WITNESS:  So -- so Jornaya has -- they have
13   this, like, it's called a "snippet."  It's a little piece of
14   code that you put on each page.  And so when you go to the
15   Web page an it loads, what happens is that piece of code
16   executes and that basically creates a connection to Jornaya
17   that allows them to capture interaction for that page.  And
18   the way that a Web page works is that when you go to the next
19   page, you've got to load the code again.  And so you'd have
20   to have that call to Jornaya once again in order for them to
21   make that capture.
22             THE COURT:  And the call is simply going to the
23   page though, because earlier you testified when I asked you
24   that everything that -- that it basically tapes everything.
25   It keeps everything.
```

```
 1                THE WITNESS:  Yes.
 2                THE COURT:  Okay.  Thank you.
 3   BY MR. MORGANROTH:
 4   Q    And do you know if the other website, YourVASurvey, do
 5   you know if they have loaded Jornaya's code on every single
 6   one of its Web pages?
 7   A    I don't know that for certain.
 8   Q    And we saw in the video playback that final page from
 9   LMB's November 12th, 2018 interaction with Ms. Hill where it
10   had what you call the "thank you" page after she clicked,
11   "calculate your free results."  Do you know if YourVASurvey
12   loads Jornaya's code on its final page?
13   A    I don't know that for certain.
14                MR. MORGANROTH:  That's all I have, Your Honor.
15   Thank you, Your Honor.
16                THE COURT:  Anything else, Counsel?
17                MR. HEDIN:  No, Your Honor.
18                THE COURT:  Let me ask you a couple of questions.
19   Since this happened in 2018, you know, the way the pages --
20   can you put up that -- that little video again.
21                Has there been any change in the way the pages look
22   today since that time?
23                THE WITNESS:  I'm sure that they've evolved
24   somewhat.  We're constantly testing to try and improve the
25   pages.
```

1     THE COURT: But do you know as you sit here today,
2  whether there's been any changes to any of those pages that
3  we saw earlier?
4     THE WITNESS: I can't say with confidence if there
5  have or haven't been. I mean, the way that it looks -- the
6  superficial way that it looks might have changed; but the
7  underlying kind of logic that we described where you have to
8  click the button and engage with a matching, things like
9  that, all those pieces have stayed steady.
10    THE COURT: Okay. And -- and when you --  did you
11 put it up? So go back up. It says, "Calculate your free
12 results." So earlier you were testifying about consent being
13 sort of key and critical to the way this whole thing
14 operates. So I -- I -- in this Exhibit 1 that is I guess
15 defendant's Exhibit 1 -- is there a box anywhere in here -- I
16 know there's a point where it says, "sent"; but is there a
17 box anywhere in there where it says something like "Consent.
18 This is the exact date and time that the person consented,"
19 because you have a lot of data here, and it seems to me if
20 that's one of the most critical things that you -- that you
21 need, that there would be a box that would indicate when the
22 consent happened -- the actual time -- you know, the actual
23 date and minute -- you know, the actual time that it
24 happened. Isn't there one here in any of these?
25    THE WITNESS: We -- it's inferred through row four

```
 1   "lead status."
 2          THE COURT:  Okay.  That's kind of what you were
 3   saying earlier, and I guess that's -- well, I said "sent."
 4   It's inferred, but why not have a -- a specific box for that?
 5   It seems like -- it seems to be -- based on your testimony,
 6   it seems to be the crux of everything we're dealing with here
 7   today.
 8          THE WITNESS:  I think that's part of why a lot of
 9   our clients use this Jornaya product where it's a third party
10   verification where I can go to them and tell them, hey, I --
11   you know, I built this.  This is how it works.  I'm capturing
12   this, and you can also use a third party to verify that I am,
13   indeed, doing as I say.
14          THE COURT:  Okay.  And then -- but Jornaya catches
15   everything; right?  They're going to catch it whether the box
16   is checked or not, they catch everything.
17          THE WITNESS:  Yes.
18          THE COURT:  Okay.  Anything else, Counsel?
19          MR. HEDIN:  Yes, Your Honor.  I just have one more
20   follow-up.
21          THE COURT:  Go ahead.
22                      RECROSS EXAMINATION
23   BY MR. HEDIN:
24   Q   Mr. Rich, you testified that the data that's reflected
25   on the first page of defendant's Exhibit 1 was sent to LMB by
```

```
1    SuitedConnector; is that right?
2    A    From the YourVASurvey, yes.
3    Q    Okay.  But -- and I think you also testified that
4    SuitedConnector wouldn't have sent it to you if the button
5    hadn't been pushed; is that right?
6    A    Yes.
7    Q    How do you know that?
8    A    Two things:  One, that is the agreement that we made.
9    And then the second is, is that's part of the -- the kind of
10   the handshake or the data exchange, right -- when we actually
11   connected to the SuitedConnector platform to do the data
12   exchange.
13            MR. HEDIN:  Okay.  But LMB doesn't have any actual
14   evidence that the button was clicked, apart from the
15   agreement between Quicken sued SuitedConnector.
16            THE WITNESS:  No.
17            MR. HEDIN:  Okay.  Thanks.  I have nothing further.
18            THE COURT:  Anything else, Counsel?
19            MR. MORGANROTH:  If I may follow up with a couple
20   of questions on the question Your Honor had.
21            THE COURT:  Okay.
22                   **REDIRECT EXAMINATION (FURTHER)**
23   BY MR. MORGANROTH:
24   Q    If you can turn to Exhibit 5 -- defendant's Exhibit 5?
25   A    Yes.
```

1   Q    And this is the Jornaya TCPA compliance report?
2   A    Uh-huh.
3   Q    If you can turn to the second page, the last paragraph,
4   it says, "How does Jornaya help keep companies
5   TCPA-compliant."
6   A    Yes.
7   Q    And then it -- I'll read it and try to read it slowly.
8   It says, "As a neutral third party witness to the events that
9   take place on a website or a call center, TCPA Guardian
10  provides facts and what happened during a consumer's visit to
11  the website or interaction with a call center representative.
12  TCP companies" -- I'm sorry -- "TCPA Guardian helps companies
13  to verify" -- and then it has bullet points about disclosures
14  and -- and language for TCP compliance.  It -- why would --
15  why would a complaint of yours use TCP Guardian as opposed to
16  just relying upon LMB's word?
17  A    It's their -- they're a third party; right?  So it
18  helps ensure -- trust would verify between our interaction
19  with the clients.
20  Q    And you were asked some questions by the judge in terms
21  of recording the consent on Exhibit 1.  If the button,
22  "calculate your free results" is not clicked, would there be
23  any consent to record?
24  A    No, that -- that wouldn't -- our matching engine
25  wouldn't engage, and therefore, there wouldn't be a

```
 1   connection between the consumer and the mortgage clients and
 2   you wouldn't have that status sent.  It wouldn't be matched
 3   to any of the parent providers either.
 4   Q    Okay.
 5            So if the button is clicked, and it says right
 6   underneath "By clicking the button, you consent," and it has
 7   the items 1 through 4 -- at that point, the matching engine
 8   is activated?
 9   A    When the button is clicked, that is when the matching
10   engine is activated.
11   Q    And if you could put up -- I think it's Exhibit 5 -- I'm
12   sorry -- Exhibit 2 -- there's "the purpose of refinance"
13   button you had testified about.  And as I understand your
14   testimony, that has to be clicked before the "calculate your
15   free results" button is activated; is that right?
16   A    Yes.
17   Q    Okay.  And under "the purpose of refinance" button,
18   there's another disclaimer -- I'm sorry -- disclosure.  It
19   says, "By selecting your E-Finance purpose, you consent to be
20   contacted, including through automated or prerecorded means
21   by our providers"; do you see that?
22   A    Yes.
23   Q    And if we wanted to know what time a consumer clicked on
24   "the purpose of refinance" button or the "calculate your free
25   results" button, that -- is that recorded the Jornaya
```

```
 1   playback if you have code for this page?
 2   A    Yes.
 3   Q    So -- okay, no further questions.  Thank you.
 4            THE COURT:  Anything else, Counsel?
 5            MR. HEDIN:  Nothing further, Your Honor.
 6            Thank you.
 7            THE COURT:  Okay.  The witness is excused.  Thank
 8   you very much.
 9            Next witness, please.
10            MR. TAYMAN:  Quicken Loans calls Larry Smith.
11   **DEFENSE'S WITNESS, LARRY SMITH, SWORN.**
12            COURTROOM DEPUTY:  Please state your name and spell
13   it for the record.
14            THE WITNESS:  My name is Larry Smith, L-A-R-R-Y
15   S-M-I-T-H.
16            THE COURT:  Go ahead.
17                       **DIRECT EXAMINATION**
18   BY MR. TAYMAN:
19   Q    Good afternoon, Mr. Smith.
20            Can you please tell the Court where you are
21   currently employed?
22   A    SuitedConnector.
23   Q    And what do you do for SuitedConnector?
24   A    I'm the chief technology officer.
25   Q    And as the chief technology officer for SuitedConnector,
```